# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

JOHN KRAMER,

      Plaintiff,

v.

MANGO LABS, LLC, DAFYDD DURAIRAJ,
and TYLER SHIPE,

      Defendants.

CIVIL ACTION NO.: 3:24-cv-01587-GMM

**DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

I.    INTRODUCTION .............................................................................................1

II.   STATEMENT OF FACTS ...............................................................................5

    A.   Mango Markets Launched in 2021. ......................................................5

    B.   In 2022, Mango Markets Suffered a $114,000,000 Criminal Exploit that the DAO, with the help of Durairaj and Shipe, Resolved by Making all Depositor Victims Whole. ......................................................................6

    C.   Kramer and Schneider Attacked the Mango DAO in Its Weakened State. ............8

    D.   Mango Labs Filed Its Original Action Against Kramer and Schneider..................9

    E.   Kramer Escalates His Attacks, Requiring the Mango DAO's Upgrade Council to Exercise its Authority to Stop Kramer's Exploit. ...............10

    F.   The Court Denied Kramer's Efforts to Obtain a Temporary Restraining Order. .................................................................................11

III.  LEGAL STANDARD......................................................................................12

IV.   ARGUMENT ..................................................................................................14

    A.   Kramer Cannot Succeed on the Merits of His Claims. ......................14

        1.   Kramer Named the Wrong Defendants....................................14

        2.   Kramer's CFAA Claim Fails. .................................................15

        3.   Kramer Cannot Prevail on His Conversion Claim...................21

    B.   Kramer is Not Experiencing Irreparable Harm and None Will Occur if the Motion is Denied.......................................................................23

V.    CONCLUSION................................................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

*Alt. Sys. Concepts, Inc. v. Synopsys, Inc.*,
374 F. 3d 23 (1st Cir. 2004) ............................................................................................18

*Arana-Santiago v. Universidad de Puerto Rico en Utuado*,
No. 19-1762 (RAM), 2019 WL 6330814 (D.P.R. Nov. 25, 2019) .......................................23

*Barreto Peat, Inc. v. Luis A. Ayala Colon Sucrs., Inc.*,
709 F. Supp. 321 (D.P.R. 1989) .......................................................................................21

*Bl(a)ck Tea Soc'y v. City of Boston*,
378 F. 3d 8 (1st Cir. 2004) .............................................................................................29

*Bruce v. Citigroup Inc.*,
75 F. 4th 297 (2nd Cir. 2023) ........................................................................................28

*Campbell Soup Co. v. Giles*,
47 F.3d 467 (1st Cir. 1995) ............................................................................................13

*Cashman Dredging and Marine Contracting Co., LLC v. Belesimo*,
No. 21-cv-11398-DJC, 2024 WL 4894639 (D. Mass. Nov. 26, 2024) ................................15

*Charlesbank Equity Fund II, Ltd. P'ship v. Blinds To Go, Inc.*,
370 F.3d 151 (1st Cir. 2004) ......................................................................................12, 14

*Chen v. Paypal*,
61 Cal. App. 5th 559, 275 Cal.Rptr.3d 767 .....................................................................22

*Clinton Plumbing and Heating of Trenton, Inc. v. Ciaccio*,
No. 09-2751, 2010 WL 4224473 (W.D. Pa. Oct. 22, 2010) ..............................................19

*Coll. of Dental Surgeons of P.R. v. Triple S. Mgmt., Inc.*,
No. 09-1209(JAF), 2011 WL 3862419 (D.P.R. Aug. 31, 2011) .........................................18

*Doble Seis Sport TV, Inc. v. P.R.*,
No. 18-1432 (ADC), 2019 WL 1153432 (D.P.R. Mar. 12, 2019) .......................................29

*Domingo Andino Marrero Estate v. Wilmington Sav. Fund Soc'y, FSB*,
No. 24-1545 (RAM), 2024 WL 4906022 (D.P.R. Nov. 27, 2024) .......................................12

*Esso Standard Oil Co. (P.R.) v. Monroig-Zayas*,
445 F.3d 13 (1st Cir. 2006) ............................................................................................29

*Estancias de Cerro Mar, Inc. v. P.R. Aqueduct and Sewer Auth.*,
No. 20-1664 (CVR), 2024 WL 263037 (D.P.R. Jan. 23, 2024) .........................................23

*Fed. Ins. Co. v. Banco de Ponce*,
582 F. Supp. 1388 (D.P.R. 1984) .....................................................................................21

*Freightliner, L.L.C. v. P.R. Truck Sales, Inc.*,
399 F. Supp. 2d 57 (D.P.R. 2005) ...................................................................................29

*Ginzburg v. Martinez-Davila*,
368 F. Supp. 3d 343 (D.P.R. 2019) .................................................................................23

*Gonzalez-Droz v. Gonzalez-Colon*,
573 F.3d 75 (1st Cir. 2009)..................................................................12, 24

*Grana v. Warden of Metro. Corr. Ctr.*,
No. 88 CIV 2793 (MBM), 1989 WL 16566 (S.D.N.Y. Feb. 23, 1989)..................28

*hiQ Labs, Inc. v. LinkedIn Corp.*,
31 F.4th 1180 (9th Cir. 2022) ..............................................................15, 16

*Houghton v. Leshner*,
No. 22-cv-07781-WHO, 2023 WL 6826814 (N.D. Cal. Sept. 20, 2023) ..............14

*In re Jem Rest Corp*,
No. 16-00152, 2016 WL 3357358 (Bankr. D.P.R. June 10, 2016)........................13

*LVRC Holdings LLC v. Brekka*,
581 F.3d 1127 (9th Cir. 2009) .............................................................16

*Lykes Lines Ltd. LLC v. Bringer Corp.*,
No. 04 Civ 4460 RMBFM, 2007 WL 766170 (S.D.N.Y. Mar. 12, 2007)..............27

*Mazurek v. Armstrong*,
520 U.S. 968 (1997)............................................................................13

*Miller v. Int'l Bus. Machs. Corp.*,
138 Fed. Appx. 12 (9th Cir. 2005)..........................................................18

*Munaf v. Geren*,
553 U.S. 674 (2008)............................................................................13

*Navarro-Rosario v. Fuxa-Catalan*,
No. 09-2253, 2010 WL 1994092 (D.P.R. May 18, 2010) ..................................15

*New Comm Wireless Servs. v. Sprintcom, Inc.*,
287 F.3d 1 (1st Cir. 2002)....................................................................14

*Nieto-Vincenty v. Valledor*,
22 F. Supp. 3d 153 (D.P.R. 2014)..........................................................15

*Pagan-Gonzalez v. United States*,
544 F. Supp. 3d 217 (D.P.R. 2021)........................................................20

*Peoples Fed. Sav. Bank v. People's United Bank*,
672 F.3d 1 (1st Cir. 2012)....................................................................13

*Phillips v. Willis Re Inc.*,
No. 20-1635 (FAB), 2020 WL 6789045 (D.P.R. Nov. 18, 2020) ......................29

*Planned Parenthood League v. Bellotti*,
641 F. 2d 1006 (1st Cir. 1992)..............................................................29

*Power Block Coin, L.L.C. v. Song*,
705 F. Supp. 3d 1293 (D. Utah 2023)......................................................24

*Samuels v. Dao*,
No. 23-cv-06492-VC, 2024 WL 4815022 (N.D. Cal. Nov. 18, 2024) ..................14

*Sanders v. Republic Servs. of Ky., LLC*,
    113 Fed. App. 648 (6th Cir. 2004)..................................................................................27

*Schiermeyer on Behalf of Blockchain Game Partners, Inc. v. Thurston*,
    697 F. Supp. 3d 1265 (D. Utah 2023) ..........................................................................24

*SEC v. Dollar General Corp.*,
    378 Fed. App. 511 (6th Cir. 2010)................................................................................27

*Spencer Cos., Inc. v. Armonk Indus., Inc.*,
    489 F.2d 704 (1st Cir. 1973) .........................................................................................13

*Sun W. Mortg. Co., Inc. v. Matos Flores*,
    No. 15-1082 (GAG), 2016 WL 1030074 (D.P.R. Mar. 10, 2016).........................19

*In re Tavitian*,
    No. 16-13829-JNF, 2018 WL 3064241 (Bankr. D. Mass. June 19, 2018) ............21

*TLS Mgmt. & Mktg. Servs. LLC v. Rodriguez-Toledo*,
    No. 15-2121 (BJM), 2018 WL 1626100 (D.P.R. Mar. 30, 2018), *rev'd and*
    *remanded on unrelated grounds*, 966 F.3d 46 (1st Cir. 2020) ...............................22

*Trademotion, LLC v. Marketcliq, Inc.*,
    857 F. Supp. 2d 1285 (M.D. Fla. 2012).......................................................................20

*Turner v. Hubbard Sys., Inc.*,
    855 F. 3d 10 (1st Cir. 2017)....................................................................................19, 20

*United States v. Am. Soc'y of Composers, Authors and Publishers*,
    32 F. 3d 727 (2nd Cir. 1994).........................................................................................27

*United States v. Nosal*,
    676 F. 3d 854 (9th Cir. 2012) ................................................................................17, 18

*US Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*,
    121 F.4th 339 (1st Cir. 2024)................................................................................12, 13

*Van Buren v. United States*,
    593 U.S. 374 (2021)...............................................................................15, 16, 17, 18

*Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*,
    645 F.3d 26 (1st Cir. 2011)....................................................................................12, 23

*Welenco, Inc. v. Corbell*,
    126 F. Supp. 3d 1154 (E.D. Cal. 2015)........................................................................20

*Welter v. Med. Pro. Mut. Ins. Co.*,
    No. 22-cv-11047-PBS, 2023 WL 2988627 (D. Mass. Feb. 23, 2023).............15, 17

*Westernbank Puerto Rico v. Kachkar*,
    No. 07-1606 (ADC/BJM), 2009 WL 6337949 (D.P.R. Dec. 10, 2009), *report*
    *and recommendation adopted*, 2010 WL 1416521 (D.P.R. Mar. 31, 2010) .........22

*Winter v. Natural Resources Defense Council*,
    555 U.S. 7 (2008).............................................................................................................13

*WrapCity Outdoor, LLC v. Icon Media, Inc.*,
   No. 23-cv-12680-DJC, 2024 WL 493469 (D. Mass. Feb. 8, 2024)........................................13

**Federal Statutes**

18 U.S.C. § 1030(a)(4)....................................................................................................................16

Defendants Mango Labs, LLC ("Mango Labs"), Dafydd Durairaj ("Durairaj"), and Tyler Shipe ("Shipe") (collectively "Defendants") file this Opposition ("Opposition") to Plaintiff John Kramer's ("Kramer") Motion for Preliminary Injunction ("Motion"):

## I.      INTRODUCTION

Kramer's preliminary injunction motion is the latest in his and Maximillian Schneider's months-long scheme to pilfer and defraud the Mango DAO.  Despite their roles as trusted senior members of the DAO, Kramer and Schneider breached their fiduciary duties, misused insider information, and through over a dozen misrepresentations and omissions, fraudulently acquired 330,000,000 MNGO tokens from the FTX bankruptcy estate—depriving the DAO of the opportunity to acquire them.  Then Kramer and Schneider secretly used those fraudulently acquired tokens to force the DAO to purchase them at extreme markups, harming the DAO in excess of 10 million dollars.  Kramer and Schneider intended to force the DAO to buy the rest of their ill-acquired MNGO tokens.  Before offloading them, though, Kramer and Schneider began attacking the Mango DAO's governance mechanism by forcing votes to pay Schneider 67.5 million new MNGO options (which the DAO would never have willingly paid, given its pending claims against him worth far in excess of that).  They also began the process of disabling the DAO's Security Upgrade Council ("Council") so that they could directly loot the DAO treasury.

The Mango DAO as well as individual DAO members assigned their claims against Kramer and Schneider to Mango Labs, and Mango Labs sued Kramer and Schneider in this Court in October 2024 for breach of their fiduciary duties, fraud, and other related causes of action.  When Kramer escalated his attacks, the Mango DAO exercised the authority provided to its Security Upgrade Council to stop Kramer's attempt to dismantle the security mechanism so that he and Schneider could have unfettered ability to loot the Mango DAO's treasury.  Kramer then

filed his baseless claims and this request for injunctive relief against Mango Labs and the two DAO members who sat on the Council.[1]

The Court should deny Kramer's request for a preliminary injunction. Kramer's underlying Computer Fraud and Abuse Act and conversion theories stretch these laws far beyond their scope. Even if these claims could hold water, which they do not, Kramer fails to meet his evidentiary burden given the factual disputes at this stage. And Kramer cannot show any irreparable harm, given that all his purported harms are easily quantifiable and because Kramer cannot articulate any harm beyond pure self-serving speculation.

**CFAA.** The Mango DAO authorized the Council to access the smart contract software that stopped Kramer's attack. Accessing this software with authorization does not constitute computer hacking, based on well-established Supreme Court authority in *Van Buren*. There was no computer or code exploit, no overcoming of any technical barriers, no use of misappropriated authentication. Kramer's claim is a prototypical attempt to render allegedly unlawful computer use a CFAA violation—something the Supreme Court has soundly rejected. Kramer further fails to allege with any specificity the fraud elements of CFAA, much less the $5,000 in required damages to a computer. Particularly at this stage of the proceedings, Kramer is far from able to show a greater than 50% chance of prevailing on this claim.[2]

**Conversion.** Kramer cannot prevail on his derivative conversion claim either, which would require a malicious and permanent deprivation of property. The Council's action was not

---

[1] Mango Labs intends to file a motion to consolidate the two cases due to their overlapping facts and claims, and because Kramer's claims should have been brought as compulsory counter-claims in Mango Labs' original action.

[2] Nor can Kramer prevail on his conspiracy claim based on his CFAA claim because: (1) Defendants did not agree to act together to commit an unlawful act; and (2) a conspiracy claim requires an underlying valid cause of action, which is not present here.

malicious or wrongful—on the contrary, it was done only to protect the DAO, as designed. The DAO had been a victim of prior governance attacks where malicious actors attempted to use fraudulently acquired tokens to force votes. It is consequently more than reasonable to have a mechanism to temporarily pause token voting when tokens are fraudulently acquired. Indeed, Kramer knew about this mechanism and his partner-in-fraud Schneider himself sat—and continues to sit—on the same Council. Further, the action does not indefinitely or permanently deprive Kramer of the possession of his tokens. He still possesses the private keys, can sell them, and will receive full access to them upon resolution of the concerns over their fraudulent acquisition. This is no different than any countless numbers of internet and cryptocurrency organizations, who can temporarily freeze accounts when there are questions of unlawful acquisition. A contrary ruling here would make it impossible for any e-commerce, payments, crypto or other exchange or processor to function. Here too, Kramer's theory is likely to fail, let alone meet a 50%-plus chance of success required for preliminary injunctive relief.

Kramer cannot show the irreparable harm required for a preliminary injunction ruling either. Any alleged loss here can be measured and compensated with monetary damages—something Kramer admits in his papers. The Court has already observed, correctly, that there is no actual urgency here. Kramer's intent was to sell the fraudulently acquired tokens to the DAO, so he cannot now claim that he desired to keep them. In any event, the DAO security mechanism merely paused Kramer's ability to use the tokens for voting. He still possesses the property and owns the private keys. He can sell his rights to the tokens if he wishes. Or he can get the tokens back after the merits stage of the case with no additional harm. Should there be any liquidation of

the Mango DAO treasury, a pro-rata share can be set aside equivalent to the MNGO tokens Kramer purports to own.[3]

Apart from his own speculative harm, Kramer also puts forth a non-sensical theory that Mssrs. Durairaj and Shipe will use their authority as DAO members to harm the DAO. This is absurd. First of all, this has been the status quo since the founding of the DAO, so Kramer's appeal to change it is antithetical to the preliminary injunction standard. Moreover, Durairaj and Shipe have—unlike Kramer—gone above and beyond to exercise their duties to the DAO at all times since its founding. They successfully recovered $67,000,000 in stolen funds from Avraham Eisenberg after his attack on the DAO. They then both spent the last two-plus years cooperating with the Department of Justice so that the victims' rights as to Eisenberg could be vindicated. They were assigned this duty by the Mango DAO because they were trusted to do it right. Durairaj and Shipe also successfully dealt with multiple regulatory investigations, also funded by the DAO, resulting in outcomes that have been very positive for the DAO's interests. Kramer has no basis to suggest that the status quo—which has been maintained for years—poses any risk of irreparable harm to him or anybody else. Durairaj and Shipe were allocated the voting authority in the DAO upon its founding precisely because they were trusted to take on the roles that they have. Kramer's arguments to the contrary are nothing more than fabricated and self-serving speculation. Such speculative injury does not constitute irreparable harm for the purposes of injunctive relief. Conversely, permitting Kramer to continue using his fraudulently acquired MNGO tokens to loot

---

[3] Indeed, the Mango DAO never had an issue purchasing the MNGO tokens at cost with a reasonable fee. (Declaration of Dafydd Durairaj ("Durairaj Decl.," ¶ 35.) This was in fact the plan and what Schneider and Kramer led the DAO to believe was happening, before breaching their duties to secretly acquire the tokens and then price-gouge the DAO anonymously. (Durairaj Decl., ¶ 14.) All to say, there is no way Kramer can lose anything he currently owns, its cost to him, or even its fair value if the Court denies the preliminary injunction motion.

the DAO will irreparably harm it and its members. He has already shown his willingness and intent to do so. This is precisely why the security mechanism and Council exists.

Kramer's theories are unsupported by the law and facts even for purposes of a merits showing, let alone the high bar required for a preliminary injunction. The Court should consequently deny Kramer's motion.

## II.    STATEMENT OF FACTS

### A.    Mango Markets Launched in 2021.

Durairaj founded Mango Markets in 2021. (Mango Labs' Complaint against Kramer and Schneider, Case No. 3:24-cv-01469 ("Mango Compl."); Declaration of Dafydd Durairaj ("Durairaj Decl."), ¶ 1, attached as Ex. A.) Schneider was also involved in the founding. (Durairaj Decl., ¶ 2.) Shipe was part of the founding team and first contributor to Mango Markets. (*Id.*; Declaration of Tyler Shipe ("Shipe Decl."), ¶ 2, attached as Ex. B.) Mango Markets is a decentralized finance protocol. (Durairaj Decl., ¶ 1.) Through the Mango Markets protocol, people are able to borrow, lend, and trade cryptocurrency and cryptocurrency derivatives. (Mango Compl., ¶ 23; Durairaj Decl., ¶ 1.) Mango Markets experienced rapid growth. (*Id.*) Mango Markets tokens are MNGO. (Durairaj Decl., ¶ 1.)

The organization that governs the Mango Markets protocol is the Mango DAO. (Mango Compl., ¶ 2; Durairaj Decl., ¶ 2.) The Mango DAO has members that take on trusted roles akin to a partnership that establishes fiduciary duties. MNGO token holders can make governance decisions about the protocol by voting with their tokens. (Mango Compl., ¶ 24; Durairaj Decl., ¶ 2.) Mango Labs is an entity that has been funded by the Mango DAO to develop software for Mango Markets and to manage Mango DAO's legal claims, including victims' claims against Eisenberg, the DAO's claims against Kramer and Schneider, and others. (Mango Compl., ¶ 17; Durairaj Decl., ¶ 2.)

Kramer joined the DAO as a trusted partner after its founding. (Durairaj Decl., ¶ 3.) He became the treasurer of the Mango DAO, and, along with Schneider, took on significant roles within the Mango DAO, comparable to officers and partners of the DAO. (Mango Compl., ¶ 25; Durairaj Decl., ¶ 3.) Durairaj and Shipe have had significant roles in the Mango DAO since its founding and accomplished critically important matters for the DAO, including helping the DAO recover $67,000,000 in stolen funds and resolving multiple civil and regulatory legal matters in the DAO's best interests. (Durairaj Decl., ¶ 3.)

**B.      In 2022, Mango Markets Suffered a $114,000,000 Criminal Exploit that the DAO, with the help of Durairaj and Shipe, Resolved by Making all Depositor Victims Whole.**

In October 2022, an individual named Avraham Eisenberg illegally exploited Mango Markets. (Mango Compl., ¶¶ 14, 26; Durairaj Decl., ¶ 5.) Eisenberg, through fraud and deception, converted approximately $114 million from Mango Markets depositors into his own accounts. (Mango Compl., ¶ 14; Durairaj Decl., ¶ 5.) Through Durairaj and Shipe's leadership, the DAO recovered $67,000,000 of the misappropriated digital assets and used the DAO's treasury to supplement such that all Mango Markets depositors were made whole within weeks of the attack. (Mango Compl., ¶ 27; Durairaj Decl., ¶ 5.)

Those depositor victims and the DAO voted to assign their claims against Eisenberg to Mango Labs, and Mango Labs sued Eisenberg on behalf of his victims in the Southern District of New York. (Durairaj Decl., ¶ 6.) In December 2022, the United States Attorney's Office for the Southern District of New York filed a criminal complaint against Eisenberg based on his actions against Mango Markets. (Mango Compl., ¶ 28; Durairaj Decl., ¶ 6.) Durairaj, through his role as the owner of Mango Labs, and Shipe, both as witnesses and victims, were heavily involved in the action against Eisenberg and sought to manage the fallout from Eisenberg's crime. (Durairaj Decl., ¶ 6.)

Mango Labs' civil complaint was stayed pending Eisenberg's criminal case. (Mango Compl., ¶ 66; Durairaj Decl., ¶ 7.) The criminal case went to trial in April 2024, where a jury convicted Eisenberg of fraud, commodities market manipulation, and wire fraud. (Mango Compl., ¶ 28; Durairaj Decl., ¶ 7.)

Eisenberg's attack on Mango Markets spawned charges against him by the United States Securities and Exchange Commission ("SEC"), as well as by the Commodity Futures Trading Commission ("CFTC"). (Mango Compl., ¶ 29; Durairaj Decl., ¶ 8.) Eisenberg's attack on Mango Markets also led to an SEC investigation of Mango Markets itself, including the Mango DAO.

Mango Labs, Durairaj, and Shipe shouldered the primary burden of handling the SEC investigation for the DAO's benefit.[4] (Mango Compl., ¶ 30; Durairaj Decl., ¶ 9.) The DAO funded Mango Labs to lead the charge on its legal matters. (*Id.*) When Kramer and Schneider threatened to block funding for Mango Labs because that would make it easier to get away with their fraud to cripple the DAO, Mango Labs continued its work despite uncertainty about funding. (Mango Compl., ¶ 66; Durairaj Decl., ¶ 9.) Shipe and Durairaj also both participated in proffers to the DOJ, SEC, and CFTC, saving Schneider and other DAO members the need to do so. After diligent work, Mango Labs negotiated a favorable settlement with the SEC on behalf of a joint defense group that included the Mango DAO—which benefited Kramer as well. (Mango Compl., ¶ 30; Durairaj Decl., ¶ 9.) Mango Labs also negotiated a favorable settlement with the CFTC that the DAO approved[5], which is currently pending. (Durairaj Decl., ¶ 9.) Kramer has not had any

---

[4]

https://dao.mango.markets/dao/MNGO/proposal/k47A3TkWnzcajDpNiHTGvb7CjHJKBQowfkyCibKsEXP

[5]

https://dao.mango.markets/dao/MNGO/proposal/35uJRJBQ64zQ82N4x32km9vRnDtvpJ5jF3MfwfzBoXvL

involvement or assisted with the DAO's legal claims on behalf of Eisenberg's victims or related to the regulatory investigations. (*Id.*) He cynically invokes these legal matters only to serve his own fraudulent ends.

At no point during any of the work Durairaj and Shipe did to help the DAO deal with its legal issues did they take any salary or payment of any kind for their efforts to help the DAO handle multiple legal matters. (Durairaj Decl., ¶ 10.)

## C.    Kramer and Schneider Attacked the Mango DAO in Its Weakened State.

While Defendants were handling the DAO's legal matters, Kramer and Schneider conspired to take advantage of the DAO in its vulnerable state. In November 2022, FTX, a cryptocurrency exchange filed for bankruptcy. (Mango Compl., ¶ 3; Durairaj Decl., ¶ 12.) Prior to its collapse, FTX allowed its users to deposit MNGO. (*Id.*) The bankruptcy estate assumed control of the MNGO. (*Id.*) In October 2023, the bankruptcy court ordered the FTX estate to sell certain assets, including the MNGO tokens. (*Id.*)

Kramer and Schneider, in their trusted positions within the DAO, represented to the DAO and its members that they were going to buy back the MNGO tokens from the FTX estate and transfer them close to cost to the DAO. (Mango Compl., ¶ 6; Durairaj Decl., ¶ 13.) This, of course, would benefit the DAO and MNGO token holders. (*Id.*) After the Eisenberg attack, the DAO wished to recover FTX's MNGO tokens itself. This was preferable to having them fall into the hands of a malicious actor who could abuse the tokens' voting power to steal from the DAO. (*Id.*)

But Kramer and Schneider instead conspired to buy the tokens for themselves while hiding their identities from the DAO. (Mango Compl., ¶ 7; Durairaj Decl., ¶ 14.) Upon information and belief, they purchased approximately 330 million MNGO that had been held by the FTX estate. (*Id.*) They then—just hours before the end of voting—anonymously deposited all 330 million

tokens into the Mango DAO,[6] thereby giving themselves more voting power, which they used to pass a proposal for Mango DAO to buy the tokens at an artificially inflated price. (Mango Compl., ¶ 8; Durairaj Decl., ¶ 14.)

Although Mango Labs and members of the Mango DAO have tried to convince Kramer and Schneider to transfer the tokens to the DAO at cost as they represented they would do, and as their fiduciary duties to the DAO required them to do, they have refused to do so. (Mango Compl., ¶ 14; Durairaj Decl., ¶ 15.) Instead, they have tried to intimidate DAO members, including members of the Council, with threats (such as this case). They have also attempted to block the DAO's funding for Mango Labs' efforts to pursue the legal claims against Eisenberg and handle other legal matters for the DAO. (Mango Compl., ¶ 66; Durairaj Decl., ¶ 15.)

### D. Mango Labs Filed Its Original Action Against Kramer and Schneider.

Mango DAO and DAO members voted to assign their claims against Kramer and Schneider to Mango Labs. (Mango Compl., ¶¶ 70, 71; Durairaj Decl., ¶ 22.)[7] Durairaj initiated a public discussion regarding Kramer's and Schneider's conduct on the Mango DAO's Discord channel and X before Mango Labs filed the complaint. (Durairaj Decl., ¶ 22.) On October 7, 2024, Mango Labs filed its Complaint against Kramer and Schneider alleging that they improperly misappropriated their positions as trusted Mango DAO members to purchase the FTX MNGO tokens at issue for their own benefit. (Compl., Ex. 6.)

---

[6] Mango DAO members were suspicious about the deposited tokens. (Mango Compl. at ¶ 9.) Nevertheless, the DAO purchased 72.8 million MNGO tokens under the proposal. (*Id.* at ¶ 13.) https://solscan.io/tx/4KcwMmoNLtmHNX9si3D3DapeiuXAmeiJhrQBQQM6iiDBXWUzpKTN x5PY4Y7sC3HTmapwWnWsHYgd1ZEXfvDSrMw7.

[7] https://x.com/dadadadaffy/status/1839329895312425156; https://dao.mango.markets/dao/MNGO/proposal/Chmsfrpt9oKWoug5ebyaik89y19xynbmPeWFa mEEBCUV.

**Kramer Escalates His Attacks, Requiring the Mango DAO's Upgrade Council to Exercise its Authority to Stop Kramer's Exploit.**

The Mango DAO created a security mechanism, through the Council, whose majority could pause DAO governance and modify its software to stop malicious attacks against the DAO. (Mango Compl., ¶ 38; Durairaj Decl., ¶ 23.)  The DAO approved this and delegated authority to the Council to protect the DAO treasury as needed.  Kramer was aware of the Council's role and capabilities.  Schneider, who worked with Kramer to procure the fraudulent tokens from FTX, was a member of the Council.  (Mot., ¶ 18; Durairaj Decl., ¶ 23.)  It is common in the Decentralized Finance industry for such councils to exist.  (Durairaj Decl., ¶ 23.)  Durairaj was an original member of the Council and continues to act as a member.  (*Id.*)

On December 6, 2024, the Mango DAO's Council took action to stop Kramer from using the fraudulently acquired MNGO tokens from FTX to pilfer the Mango DAO treasury. Specifically, Kramer sought to force more buybacks of MNGO tokens at inflated prices, and also intended to directly liquidate the Mango DAO treasury for his own purposes.  (Durairaj Decl., ¶ 24.)  He also was in the process of forcing votes that would disable the Council's ability to protect the DAO.  (*Id.*, ¶ 32.)  The Council and its members, including Durairaj and Shipe, all independently understood that Kramer's actions would be fatal to the DAO and its members. (Durairaj Decl., ¶ 24; Shipe Decl., ¶ 9.)  Several members of the Council, rather than exercise their votes, chose to abstain by burning their voting tokens.  They did so, on information and belief, either because they were no longer interested in being involved with the DAO or out of fear of Kramer's threats to file frivolous legal action, such as this action.  (Durairaj Decl., ¶ 24.)  Durairaj and Shipe did not resign from the Council and exercised their properly given authority and access to the Council smart contract to stop Kramer's attack by freezing Kramer's improperly obtained

tokens to prevent harm to the DAO.  (Mot., ¶ 18; Durairaj Decl., ¶ 24.)[8]  The software that permits the Council to function does not, and never has, required anything other than a simple majority of votes.  (Durairaj Decl., ¶ 24.)  There is no requirement that the Council have seven members to function.  (*Id.*)

Like with other DAO legal issues, here once again Durairaj and Shipe were willing to expose themselves to great personal risk—as this frivolous lawsuit and preliminary injunction request shows—for the benefit of the DAO.  (Durairaj Decl., ¶ 25.)

Indeed, absent the Council's action, Kramer and Schneider would continue to pillage the DAO treasury.  Prior to the Council's action, Kramer and Schneider used their fraudulently acquired tokens to unjustly enrich Schneider with 67,500,000 MNGO options, despite the fact that he has harmed the DAO far in excess of that amount through his wrongful conduct.  Kramer and Schneider also used their fraudulently acquired tokens to force the DAO to overpay for a portion of them, costing the DAO millions.  They have repeatedly stated their intentions to continue doing so.  Kramer and Schneider further have attempted to interfere with the DAO and victims' assignment of claims to Mango Labs to pursue against Eisenberg, simply because it provided them leverage to get away with their fraud.

**F.     The Court Denied Kramer's Efforts to Obtain a Temporary Restraining Order.**

After Kramer filed this separate action, Judge Silvia L. Carreno-Coll transferred the action to this Court on December 27, 2024.  (Dkt. No. 11.)  On December 27, 2024, this Court denied Kramer's Motion without prejudice.  (Dkt. No. 13.)  On December 28, 2024, Kramer refiled his

---

[8] Kramer also posted on Discord about the Council members' burning their tokens.  (Durairaj Decl., ¶ 24, Ex. 7.)  Kramer therefore knew about the Council, its role, and capabilities.  He tried to hijack the Council for himself, gambling that he could do this before Durairaj and Shipe could act in their capacity as Council members to freeze his tokens or otherwise stop him from using his fraudulently obtained tokens to harm the DAO.

Motion. (Dkt. No. 14.) On January 5, 2025, this Court denied Kramer's request for a temporary restraining order ("TRO") because he failed to show irreparable harm, necessary for emergency injunctive relief. (Dkt. No. 18.) The Court concluded:

> Kramer has not established that he would suffer *immediate* and irreparable harm *before* Defendants are given an opportunity to present their position to the Court. Other than stating that his MNGO tokens are frozen, Kramer's Motion for TRO only alleges hypothetical harms. For example, Kramer argues that Defendants *could* vote to dissolve the Mango DAO; that Defendants *could* distribute the Mango DAO treasury; that the Mango DAO *could* vote to withdraw the settlement offer proposed to the CFTC…There are simply no indications that these hypothetical scenarios pose a risk of *immediate* injuries, losses, or damages that will result *before* Defendants are given a chance to be heard in opposition.

> (Order, Dkt. No. 18.) (Emphases in original.)

Indeed, none of the risks Kramer speculated about have occurred, and no harm from any of these speculative scenarios will occur if the Court denies Kramer's injunction request.

## III. LEGAL STANDARD

To determine whether injunctive relief is warranted, courts must consider (1) the movant's likelihood of success on the merits; (2) whether and to what extent the movant will suffer irreparable harm in the absence of preliminary injunctive relief; (3) the balance of relative hardships; and (4) the effect, if any, that either an injunction or the absence of one will have on the public interest. *See US Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*, 121 F.4th 339, 347 (1st Cir. 2024) (citation omitted).[9]

---

[9] *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011); *Charlesbank Equity Fund II, Ltd. P'ship v. Blinds To Go, Inc.,* 370 F.3d 151, 161-162 (1st Cir. 2004); *see also Domingo Andino Marrero Estate v. Wilmington Sav. Fund Soc'y, FSB*, No. 24-1545 (RAM), 2024 WL 4906022, at *1 (D.P.R. Nov. 27, 2024) (explaining the same four factors apply in requests for temporary and preliminary injunctions). The first two factors are the most critical. *See Gonzalez-Droz v. Gonzalez-Colon*, 573 F.3d 75, 79 (1st Cir. 2009) (citation and marks omitted).

"A preliminary injunction is a potent weapon that should be used only when necessary to safeguard a litigant's legitimate interests." *Charlesbank Equity Fund II, Ltd. P'ship v. Blinds To Go, Inc.*, 370 F.3d 151, 163 (1st Cir. 2004). Because it is an "extraordinary and drastic remedy," a court should not grant a request for one "unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original). Given the high standard, an injunction is never awarded as a matter of right. *See Winter v. Natural Resources Defense Council*, 555 U.S. 7, 24 (2008) (rejecting the Ninth Circuit's alternative "sliding scale" test insofar as it permits an injunction based on probability rather than likelihood of irreparable harm); *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008); *US Ghost Adventures, LLC*, 121 F.4th at 347 ("A preliminary injunction is an extraordinary and drastic remedy that is never awarded as of right."); *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 8–9 (1st Cir. 2012) (same).

"The burden of providing a factual basis sufficient to justify a preliminary injunction rests with the party seeking the injunction." *In re Jem Rest Corp*, No. 16-00152, 2016 WL 3357358, at *1 (Bankr. D.P.R. June 10, 2016) (citation omitted); *WrapCity Outdoor, LLC v. Icon Media, Inc.*, No. 23-cv-12680-DJC, 2024 WL 493469, at *1 (D. Mass. Feb. 8, 2024) (citation omitted).

Where there is a major factual dispute (such as here), injunctive relief is not appropriate. *See, e.g., Campbell Soup Co. v. Giles*, 47 F.3d 467, 470 (1st Cir. 1995) ("To be sure, when the parties' competing versions of the pertinent factual events are in sharp dispute, such that the propriety of injunctive relief hinges on determinations of credibility, the inappropriateness of proceeding on affidavits alone attains its maximum.") (citations and marks omitted).[10] "A finding

---

[10] *Spencer Cos., Inc. v. Armonk Indus., Inc.*, 489 F.2d 704, 707 (1st Cir. 1973) (affirming denial of preliminary injunction where there was "a major factual dispute" and "uncertainty whether [the plaintiff] would ever prevail on the merits"); *WrapCity Outdoor, LLC v. Icon Media, Inc.*, No. 23-

of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004). Here, Kramer falls far short of the standard.

## IV. ARGUMENT

### A. Kramer Cannot Succeed on the Merits of His Claims.

"The *sine qua non*" of the four-part injunction inquiry is "likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *New Comm Wireless Servs. v. Sprintcom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002). Kramer fails this factor for multiple reasons.[11]

### 1. Kramer Named the Wrong Defendants.

Kramer sued the wrong parties. Mango Labs, Durairaj, and Shipe did not freeze Kramer's fraudulently obtained tokens. The DAO itself did—through authority provided to the DAO Council. The Mango DAO is an independently cognizable entity. *See Samuels v. Dao*, No. 23-cv-06492-VC, 2024 WL 4815022, at *5–7 (N.D. Cal. Nov. 18, 2024) (finding that a DAO was a cognizable entity akin to a partnership with duties flowing among the trusted partners); *Houghton v. Leshner*, No. 22-cv-07781-WHO, 2023 WL 6826814, at *1 (N.D. Cal. Sept. 20, 2023). Kramer's misidentification is similar to someone suing a bank teller or website customer service representative, or security team, for a company or platform's decision to freeze assets. Kramer

---

cv-12680-DJC, 2024 WL 493469, at *3 (D. Mass. Feb. 8, 2024) ("Where the factual record is contested, particularly as to the key consideration of likelihood of success on the merits, a preliminary injunction may not be proper.").

[11] Even if Kramer prevailed on his claims, Mango Labs' claims against him and Schneider swallow any purported harm alleged by Kramer and fully offset any damage. Kramer needs to demonstrate that he will win against all of Mango Labs' claims to be entitled to injunctive relief. It is not enough for him to establish a likelihood of success on his claims without explaining how he will beat Mango Labs' claims in the Original Action, which have much larger equity and money damages implications. Kramer fails to even try to address this.

does not even attempt to articulate why the Mango DAO's (or Mango Labs') corporate veil should be pierced to allow him to sue Durairaj and Shipe, nor could he establish so at all, let alone at the preliminary injunction stage of the proceedings. *See, e.g., Nieto-Vincenty v. Valledor*, 22 F. Supp. 3d 153, 162-63 (D.P.R. 2014) (plaintiffs failed to provide "strong and robust evidence" that an individual was an alter ego of a corporate entity); *Navarro-Rosario v. Fuxa-Catalan*, No. 09-2253 (GAG/MEL), 2010 WL 1994092, at *4-6 (D.P.R. May 18, 2010) (plaintiff failed to show that defendants, as officials of another defendant corporation, should be liable based on "strong and robust evidence").

### 2. Kramer's CFAA Claim Fails.

Kramer attempts to turn the clock back on twenty years of CFAA jurisprudence. His theory seeks to hold Defendants liable for using software they were authorized to access and taking administrative action that they were permitted to do as members of the DAO's Council. "The CFAA was enacted to prevent intentional intrusion onto someone else's computer—specifically, computer hacking;" it is not a vehicle for the baseless allegations of purported misuse Kramer's Complaint articulates. *See hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1196 (9th Cir. 2022).

The Supreme Court shut the door on theories like Kramer's, by holding that CFAA liability requires a "gates-up-or-down inquiry" where a hacker breaks through a gate. *Van Buren v. United States*, 593 U.S. 374, 376 (2021).

Courts nationwide, including in this Circuit, have adopted *Van Buren*'s formulation to avoid broadening the CFAA to make mere computer misuse unlawful. Where defendants access information using a password or by simply utilizing their permitted scope of access, like here, no CFAA violation follows. *See Welter v. Med. Pro. Mut. Ins. Co.*, No. 22-cv-11047-PBS, 2023 WL 2988627, at *6-8 (D. Mass. Feb. 23, 2023) (citing *Van Buren* and holding that using one's password to access information was not a violation of the CFAA); *Cashman Dredging and Marine*

*Contracting Co., LLC v. Belesimo*, No. 21-cv-11398-DJC, 2024 WL 4894639, at *13 (D. Mass. Nov. 26, 2024) (citing *Van Buren* and holding that unfettered access used to procure proprietary information was not a violation of the CFAA).

The CFAA "is best understood as an anti-intrusion statute and not as a 'misappropriation statute'" and the CFAA should not be "broadly" interpreted "to cover violations of corporate computer use restrictions or violations of a duty of loyalty." *HiQ Labs,* 31 F.4th at 1196; *see also LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1130 (9th Cir. 2009) (noting that the CFAA "was originally designed to target hackers who accessed computers to steal information or to disrupt or destroy computer functionality …").

Kramer attempts to plead CFAA violation under the heightened standard of Section 1030(a)(4), which provides a defendant violates the CFAA if they "knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period[.]" (18 U.S.C. § 1030(a)(4).) Kramer's claim fails under every prong here. Defendants had authorization to access the software at issue and did not exceed their access, Kramer fails to show that Defendants knowingly intended to defraud Kramer, and Kramer cannot demonstrate any damages, much less the minimum level of damages necessary to maintain a CFAA claim.

First, Kramer admits[12] that DAO Council members, including Durairaj and Shipe, were authorized to access the software at issue and were given that authorization by the DAO.[13] This

---

[12] Mot. at ¶ 16; Complaint at ¶ 24.
[13] Durairaj Decl., ¶ 23.

ends the inquiry under *Van Buren* and the consensus of courts nationwide. Here, the gates were down. Access was given. Defendants did not misappropriate any passwords, did not exploit any code, and did not overcome any technical barriers to hack or intrude on any computer. They merely used the software as designed, to stop Kramer's attack. This means there is no CFAA liability. *See, e.g.*, *Van Buren*, 593 U.S. at 376 ("one either can or cannot access a computer system, and one either can or cannot access certain areas within the system"); *United States v. Nosal*, 676 F. 3d 854, 863 (9th Cir. 2012) (CFAA is to prevent "the circumvention of technological access barriers" through hacking). Kramer's theory about exceeding authorized access similarly fails, as it impermissibly attempts to use the CFAA to target the alleged "misuse or misappropriation" of information. *Id.*; *see also Van Buren*, 593 U.S. at 396 (noting that a law enforcement officer's use of his access to a computer "for an improper purpose" did not rise to the level of a CFAA violation).

Kramer's entire CFAA claim is premised on the argument that the purported DAO policy that governed the Council required four of seven members in the Council to vote on any action. (Mot., n.10, 12.) This is unsupported by any evidence and it is not correct. At all times, only a majority of the Council was needed for a vote—this was part of the security mechanism. (Durairaj Decl., ¶ 23.) Further, nothing prevented Council members from resigning their voting power. (*Id.*, ¶ 24.)

And even if Kramer's factual assertions were true, and they are not, this would not support a CFAA claim because there is no hacking involved. The Supreme Court "squarely rejected the notion that one may violate the CFAA simply by 'using a computer network in a way contrary to what … policy prohibits.'" *Welter*, 2023 WL 2988627, at *7 (D. Mass. Feb. 23, 2023) (citing *Van Buren*, 593 U.S. at 381). That is just what Kramer alleges. He claims that any action of the Council

that did not include approval of four members violated some sort of DAO policy and by extension, the CFAA. (Mot., 12.) If Kramer's argument were given credence, it would allow for criminalization of any website terms of use violation by a normal citizen or employee. *See, e.g.*, *Van Buren*, 593 U.S. at 394-396 (noting that under the reading proposed by Kramer, "millions of otherwise law-abiding citizens are criminals"); *Nosal*, 676 F. 3d at 859-63 (broad liability under the CFAA would criminalize routine online behavior).

Second, Kramer fails to allege any facts that suggest any fraud took place, necessary for his CFAA claim. The theory of liability Kramer pursues requires particularized allegations that satisfy Federal Rule of Civil Procedure 9(b). *See Miller v. Int'l Bus. Machs. Corp.*, 138 Fed. Appx. 12, 16-17 (9th Cir. 2005) (affirming dismissal because plaintiff failed to allege fraud associated with Section 1030(a)(4) with sufficient particularity).[14]

Here, Kramer does nothing more than provide general allegations of authorized conduct and assert in conclusory fashion that this supports his fraud claim. (Mot., ¶¶ 1, 18, 26, p. 12.) The conclusory statement that Defendants "fraudulently accessed a computer to deprive the Plaintiff of the use and the value of his property," (Mot., ¶ 1) is inadequate to support a claim, CFAA or otherwise. *See Miller v. Int'l Bus. Machs. Corp.*, 138 Fed. Appx. 12, 16-17 (9th Cir. 2005) (affirming dismissal of Section 1030(a)(4) claim because it was insufficiently plead to satisfy Federal Rule of Civil Procedure 9(b)); *Coll. of Dental Surgeons of P.R. v. Triple S. Mgmt., Inc.*, No. 09-1209(JAF), 2011 WL 3862419, at *4 (D.P.R. Aug. 31, 2011) (affirming dismissal of a

---

[14] A plaintiff must provide details such as who made the statement, what the false statement was, and when it was made. *Coll. of Dental Surgeons of P.R. v. Triple S. Mgmt., Inc.*, No. 09-1209 (JAF), 2011 WL 3862419, at *4 (D.P.R. Aug. 31, 2011) (holding that plaintiffs' general allegations of fraud were insufficient to satisfy Rule 9(b)); *Alt. Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F. 3d 23, 29 (1st Cir. 2004) (affirming dismissal of a misrepresentation claim and noting that Rule 9(b) requires the who, what, when and where of the alleged fraud).

fraud claim because plaintiffs made "only general allegations against Defendants ..." without specifying the false statements and who made them). Durairaj was completely transparent and above board in taking the actions he did in his role as a member of the Council. (Durairaj Decl., ¶ 23.) So was Shipe. (Shipe Decl., ¶ 9.) Indeed, Durairaj initiated a public discussion of Kramer's and Schneider's conduct on Mango DAO's Discord channel and X prior to Mango Labs filing Mango's Complaint.[15] (Durairaj Decl., ¶ 22.) He publicly announced the Council's decision to freeze Kramer's and Schneider's tokens to prevent harm to the DAO. (*Id.*, ¶ 26.) This is in stark contrast to the multiple fraudulent omissions and misrepresentations that Kramer and Schneider undertook to acquire the MNGO tokens from FTX.

Further, Kramer fails to adequately plead the required $5,000 in damages. *See Turner v. Hubbard Sys., Inc.*, 855 F. 3d 10, 13 (1st Cir. 2017) (failure to show $5,000 in damages a "fatal defect"); *Sun W. Mortg. Co., Inc. v. Matos Flores*, No. 15-1082 (GAG), 2016 WL 1030074, at *3-4 (D.P.R. Mar. 10, 2016) (plaintiff failed to satisfy the damages threshold). The CFAA additionally requires a showing of at least $5,000 in damage related to the protected computer at issue. *Clinton Plumbing and Heating of Trenton, Inc. v. Ciaccio*, No. 09-2751, 2010 WL 4224473, at *6 (W.D. Pa. Oct. 22, 2010) (explaining that courts interpret the loss provision in the CFAA "to mean the remedial costs of investigating a computer for damage, remedying damage done, and costs incurred while the computer is inoperable."). Kramer makes only vague allegations of damages contending that "[t]he Defendants have fraudulently reduced the value of the Plaintiffs' tokens to $0 …" without specificity. (Mot. at 15.) Putting aside that this means there can be no irreparable harm finding for purposes of the preliminary injunction, it is insufficient for purposes

---

[15] https://x.com/dadadadaffy/status/1839329895312425156;
https://dao.mango.markets/dao/MNGO/proposal/Chmsfrpt9oKWoug5ebyaik89y19xynbmPeWFa
mEEBCUV.

of the CFAA.  *See Turner, supra,* at  *v. Hubbard Sys., Inc.*, 855 F. 3d 10, 13-14 (1st Cir. 2017) (speculative damages not adequate to grant recovery for a CFAA violation).[16]

Finally, Kramer's derivative CFAA conspiracy claim fails too.  First, a claim for CFAA conspiracy requires an associated liability based on Section 1030(a)(4).  Kramer will not be able to get there at the merits stage of the case, even if his allegations are true (and they are not).  He is certainly far from the evidentiary bar needed to prove computer hacking at the preliminary injunction stage.  Second, to prevail on a claim for conspiracy under the CFAA, a plaintiff must provide "evidence of an agreement and common activities in furtherance of the unlawful act." *Welenco, Inc. v. Corbell*, 126 F. Supp. 3d 1154, 1176 (E.D. Cal. 2015) (citations omitted). "Without a showing of any attempts to violate the statute, there is no triable issue of a conspiracy to do so." *Id.*  Kramer has failed to allege (let alone provide any evidence) a plausible conspiracy between Defendants to "common activities in furtherance of the unlawful act."  Durairaj and Shipe, on the contrary, independently fulfilled their duties as Council members for the DAO.  They did not conspire to do anything.  This means Kramer cannot prevail on his CFAA conspiracy claim. *See Trademotion, LLC v. Marketcliq, Inc.*, 857 F. Supp. 2d 1285, 1293-94 (M.D. Fla. 2012) (dismissing Section 1030(a)(4) count because plaintiffs failed to allege conspiracy with any particularity).

Because Kramer cannot prove (and does not even allege) hacking, fails to support a showing of fraud, and has no evidence of any conspiracy, all his CFAA claims are likely to lose at

---

[16] Further, "damages for a violation involving only conduct described in subsection (c)(4)(A)(i)(I) are limited to economic damages," 18 U.S.C. § 1030(g), which are remedied by monetary damages and do not constitute irreparable harm necessitating injunctive relief.  *See Pagan-Gonzalez v. United States*, 544 F. Supp. 3d 217, 219, n.1 (D.P.R. 2021) (noting the loss of economic harm does not constitute "irreparable injury" because the financial loss can be remedied with money damages) (citation omitted).

the merits stage of the case. He is nowhere near the bar needed for preliminary injunctive relief at this point in the action.

### 3.    Kramer Cannot Prevail on His Conversion Claim.

Law in this District is clear that conversion is "not the simple acquisition of another's property" rather, it is "the ***malicious*** and ***wrongful*** privation of the ownership rights, the illegal exercise, or the assumption of authority over another's property, thereby depriving the lawful owner or possessor, ***permanently*** or for an ***indefinite*** period, of its use and enjoyment." S*ee Fed. Ins. Co. v. Banco de Ponce*, 582 F. Supp. 1388, 1393 (D.P.R. 1984) (citations omitted) (emphasis added).[17]

Kramer cannot prevail on the merits of his conversion claim as a matter of law for at least three reasons: (1) Defendants were given authority by the DAO to stop attacks against it; (2) the freeze action was carefully measured, narrowly tailored, and not malicious or wrongful; and (3) the freeze action is temporary, not permanent and indefinite.

First, the DAO purposefully set up the Council to stop attacks exactly like what Kramer was attempting. It trusted Council members, including Durairaj and Shipe, to do the right thing and protect the DAO. Kramer and other DAO members knew of the Council. Anybody who used the DAO software to vote for governance proposals submitted their tokens to the internal jurisdiction of the Council at all times.

Second, the freezing action was not malicious or wrongful. Tellingly, Kramer does not claim that his tokens were frozen maliciously. He only claims that Defendants' actions were "intentional." (Mot., 14.) But "a willful and malicious injury does not follow as of course from

---

[17] *Barreto Peat, Inc. v. Luis A. Ayala Colon Sucrs., Inc.*, 709 F. Supp. 321, 323 (D.P.R. 1989) is the **only case** Kramer cites in his brief, yet it—on its face—supports denying his motion because there is no possible way Kramer can show the deprivation of freezing his tokens was malicious, wrongful, permanent, or indefinite like the conduct in *Barreto. Id.*

every act of conversion." *In re Tavitian*, No. 16-13829-JNF, 2018 WL 3064241, at *9 (Bankr. D. Mass. June 19, 2018). A malicious freezing of the tokens would mean that it was meant only to hurt Kramer and for no other reason. But that is not what happened here. The Council's vote to freeze the tokens was a defensive action to save the DAO against Kramer's attempts to loot the DAO. It is routine for online platforms to freeze items on the platform when there are concerns over fraud or unlawful conduct, as there were here. Doing so is not conversion. *See, e.g.*, *Chen v. Paypal*, 61 Cal. App. 5th 559, 576, 275 Cal.Rptr.3d 767 (rejecting conversion theory against PayPal for freezing funds).

Moreover, where there is an underlying dispute regarding fraud, contracts, and competing assertions of duty, that cuts against a conversion claim over assets at issue. *Westernbank Puerto Rico v. Kachkar*, No. 07-1606 (ADC/BJM), 2009 WL 6337949, at *33 (D.P.R. Dec. 10, 2009), *report and recommendation adopted*, 2010 WL 1416521 (D.P.R. Mar. 31, 2010) (denying conversion claim where there were overlapping issues around duties and contracts). It is "established law that a party cannot support a conversion claim" where the "damages suffered arise as a consequence" of a "contract" or a "non-contractual duty." *TLS Mgmt. & Mktg. Servs. LLC v. Rodriguez-Toledo*, No. 15-2121 (BJM), 2018 WL 1626100, at *13 (D.P.R. Mar. 30, 2018), *rev'd and remanded on unrelated grounds*, 966 F.3d 46 (1st Cir. 2020). This is exactly the case here. Due to the DAO's plethora of fraud and breach of duty claims against Kramer for the very fraudulently acquired MNGO tokens at issue, he cannot assert a conversion claim without resolving all those claims first. Kramer does not even attempt to address the DAO's many claims against him in his motion. This failure precludes preliminary injunctive relief, because he cannot show a likelihood of merits success of any of his claims if he loses the claims from the DAO.

Finally, Kramer cannot succeed on his conversion claim because Defendants do not have possession or authority over Kramer's tokens indefinitely or permanently. (Durairaj Decl., ¶ 27.) The freeze action is temporary. The freeze action is only during the pendency of the case. In the meantime, in any event, Defendants have not deprived Kramer of any property. Kramer still controls the private keys that allow access to his tokens, and he has the ability to transfer those keys to anyone at any time. (*Id.*) The Council has not and will not move or appropriate any of the frozen tokens. (*Id.*) All the freeze does is stop Kramer from using his fraudulently acquired tokens to attack the DAO. Given that he planned to offload them anyway, he has no credible theory for why he should be permitted to loot the DAO treasury with these tokens. (*Id.*, ¶ 34.)

Permitting a conversion claim—particularly at the preliminary injunction stage—under these facts would make every internet and e-commerce platform unable to enforce its Terms and use the commonly prevalent security measures allowing account freezes. Mango DAO here has acted prudently and responsibly in a way that preserves all of Kramer's rights. Consequently, Kramer cannot succeed on his conversion claim.

### B. Kramer is Not Experiencing Irreparable Harm and None Will Occur if the Motion is Denied.

To satisfy the "irreparable harm" requirement the moving party must establish that legal remedies (i.e., monetary awards) are inadequate. *See Estancias de Cerro Mar, Inc. v. P.R. Aqueduct and Sewer Auth.*, No. 20-1664 (CVR), 2024 WL 263037, at *3 (D.P.R. Jan. 23, 2024) (denying a petition for injunctive relief because economic damages do not equate to irreparable harm).[18] There is a high bar to show future harm—it cannot be speculative and past harm alone is

---

[18] *Ginzburg v. Martinez-Davila*, 368 F. Supp. 3d 343, 347-49 (D.P.R. 2019) (same); *Arana-Santiago v. Universidad de Puerto Rico en Utuado*, No. 19-1762 (RAM), 2019 WL 6330814, at *3-4 (D.P.R. Nov. 25, 2019) (same); see also *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011) (inadequacy of legal remedies is key).

insufficient.  *See, e.g.*, *Gonzalez-Droz v. Gonzalez-Colon*, 573 F.3d 75, 79 (1st Cir. 2009) (citation omitted).  The Court already ruled that there was no irreparable harm when it denied the TRO. The same should result here as to Kramer's preliminary injunction request.

First, Kramer seeks relief related to the value of his tokens or the funds in the DAO treasury,[19] both of which can be addressed with an award of money damages.  *See Schiermeyer on Behalf of Blockchain Game Partners, Inc. v. Thurston*, 697 F. Supp. 3d 1265, 1273 (D. Utah 2023) (no irreparable harm because "cryptocurrency tokens are fungible and easy to value"); *Power Block Coin, L.L.C. v. Song*, 705 F. Supp. 3d 1293, 1314–15 (D. Utah 2023) (no irreparable harm where the claimant seeks "monetary damages" "or the return of his Bitcoin", which the court found "is a form of monetary damages in another currency").[20, 21]

Second, the narrow freeze action poses zero risk of any harm to Kramer that cannot be remedied.  Mango DAO does not intend to liquidate or transfer the frozen tokens.  (Durairaj Decl., ¶ 27.)  It is merely stopping the tokens from being used to attack the DAO's governance.  If the DAO treasury is liquidated or dissolves for any reason—something many DAO members have suggested, including Schneider—the DAO would set aside the pro-rata amount of the treasury needed to satisfy any cash-out from the frozen tokens.  (*Id.*, ¶ 33.)  Kramer would thus not lose anything, to the extent he would be owed anything in a dissolution.  (*Id.*)  Further, Kramer's

---

[19] Compl. at Prayer for Relief; Mot. at 15-16.

[20] "And cryptocurrency tokens are the epitome of fungible property: Their entire purpose is to provide an analogue for traditional currency, and they are traded on public exchanges with posted conversion rates to the dollar."  *Schiermeyer on Behalf of Blockchain Game Partners, Inc. v. Thurston*, 697 F. Supp. 3d 1265, 1272 (D. Utah 2023).  Given the relationship between traditional currency and cryptocurrency, there is no reason that Kramer's purported damages (if any) could not be remedied through a monetary award.

[21] The only potential "harm" identified in the Motion not addressable by a monetary award is the alleged violation of the Final Judgment in the SEC action.  (Mot., 15.)  For reasons addressed below, Kramer's cynical claims regarding an alleged violation of SEC Final Judgment are misinformed, meritless, and do not support an irreparable harm finding.

explicit scheme was to force the DAO to buy back the MNGO tokens that he fraudulently procured from FTX.  (Compl., Ex. 6, ¶ 51.)  So Kramer should have no problem with the MNGO tokens being frozen.  His only concern is whether he can use them to force the DAO to pay an inflated price—this is not something the Court should permit by virtue of a preliminary injunction.

All of Kramer's concocted concerns about Durairaj and Shipe's actions in the DAO are speculative and do not support a showing of irreparable harm to Kramer, let alone the DAO.

It has been the status quo for years that Durairaj and Shipe have significant voting power in the Mango DAO.  (Durairaj Decl., ¶ 4.)  They have at all times used their votes in the DAO's interests and conducted themselves to uphold their duties to the DAO.  Durairaj and Shipe led the charge in ensuring that Eisenberg's victims were made whole.[22]  Mango Labs, owned by Durairaj, then accepted claims assignments from Eisenberg's victims and the DAO to pursue the recovery of the remaining funds.  (Durairaj Decl., ¶ 6.)  Mango Labs led a joint defense group—that included the DAO and its members—to favorable resolution of multiple regulatory inquiries spawned by Eisenberg's attack.  (Mango Compl., ¶30, Durairaj Decl., ¶ 9.)  Mango Labs, Duriraj, and Shipe continue to act in the best interests of the DAO, including through this case and through the DAO's recent assignment of claims to Mango Labs against Kramer and Schneider.  (Durairaj Decl., ¶ 22.)  There is no evidence that Durairaj and Shipe seek to enrich themselves at the DAO or anybody else's expense.  On the contrary, Durairaj and Shipe have spent years dedicating countless hours of their time to the DAO's legal interests with zero payment. (Durairaj Decl., ¶ 10.)  Even now, DAO members look to Durairaj and Shipe to help the DAO deal with Kramer, Schneider, and other business.

---

[22] https://discord.com/channels/791995070613159966/1275478789127802942

Kramer's purported concerns regarding the DAO representative are a red herring. Kramer claims that Defendants will somehow interfere with the DAO representative in a way that harms the DAO. This is nonsense. Mango Labs was the one who suggested the DAO representative in the first place, not due to any conflict but only out of caution. (Durairaj Decl., ¶ 16.) Further, the DAO representative's role is limited to being a communications conduit and signing on behalf of the DAO—they have no authority to do anything or bind the DAO to anything without a vote. (*Id.*, ¶ 17.) Here, the DAO representative's role is winding down because the SEC settlement is completed. The CFTC settlement has been approved. Further, there are significant concerns that DAO members have raised about the current DAO representative's conflicts of interest with the DAO. (*Id.*, ¶ 19.) The current DAO representative has supported Kramer and Schneider's fraud, on information and belief, because they wished to take extra payments from the DAO to themselves. (*Id.*) To the extent a new representative would be necessary for the DAO, it would be easy to appoint one. (*Id.*, ¶ 20.) Thus there is no articulable issue, and certainly no undisputed issue, with respect to the DAO representative that supports preliminary injunctive relief.

Kramer's speculation about the CFTC falls apart too. There is nothing to indicate that Durairaj or Shipe would do anything to compromise the CFTC settlement or act against the DAO's interests with respect to that settlement. Durairaj and Shipe, with no help from Kramer (and in fact significant challenges caused by his fraud), tee'd up that CFTC settlement on behalf of a joint defense group that included the DAO. When terms were finally reached with the CFTC, DAO members voted to approve them with a 100% approval rate.[23] Durairaj also publicly requested

---

[23]

https://app.realms.today/dao/MNGO/proposal/35uJRJBQ64zQ82N4x32km9vRnDtvpJ5jF3Mfwf zBoXvL

funding for the legal expenses associated with the work giving rise to this settlement.[24] The transparency exemplified during each step of the settlement process evidences only that any settlement will protect all users, including Kramer, and demonstrates no irreparable harm will result.

There is no risk of irreparable harm to Kramer with respect to the SEC either. Kramer's Complaint and Motion are premised on the false theory that Mango Labs has not complied with the SEC settlement. This is absurd. Mango Labs does not have MNGO tokens, it has complied with the SEC settlement, and it has communicated its compliance with the SEC. (Durairaj. Decl., ¶ 30.) There are no issues. To the extent there were, Kramer has no standing to seek enforcement of a judgment in an unrelated case to which he is not a party. *See United States v. Am. Soc'y of Composers, Authors and Publishers*, 32 F. 3d 727, 733 (2nd Cir. 1994) (holding that a non-party to a consent judgment lacked standing to enforce the consent judgment).[25]

The tokens Kramer is concerned with belong to Durairaj. (Durairaj Decl., ¶ 28.) To comply with the SEC's Final Judgment, on November 1, 2024 Mango Labs burned its approximately 96,000 tokens. (*Id.*, ¶ 9, Ex. 1.) The "2CC Wallet" Kramer references has always and continues to belong to Durairaj. (*Id.*, ¶ 28.) It is not uncommon for DAO members, such as

---

[24] https://dao.mango.markets/dao/MNGO/proposal/k47A3TkWnzcajDpNiHTGvb7CjHJKBQowfkyCibKsEXP

[25] *SEC v. Dollar General Corp.*, 378 Fed. App. 511, 514-16 (6th Cir. 2010) ("Thus, Supreme Court and Sixth Circuit precedent are clear that nonparties to a consent decree or, analogously, an agreed or consent judgment entered by the Court incorporating a settlement agreement or a consent decree, do not have standing to enforce a judgment."); *Lykes Lines Ltd. LLC v. Bringer Corp.*, No. 04 Civ 4460 RMBFM, 2007 WL 766170, at *5 (S.D.N.Y. Mar. 12, 2007) (citing *Sanders v. Republic Servs. of Ky., LLC*, 113 Fed. App. 648, 650 (6th Cir. 2004)) (concluding that a non-party to a judgment had no standing to enforce it).

Mr. Durairaj, to use a personal wallet when putting up a vote for a proposal. (*Id.*) That does not mean the wallet is owned by an entity.[26]

In any event, as explained in Mango Labs' Complaint in the Original Action, Kramer and his partner Schneider are the parties whose actions have violated the judgment in the SEC action.[27] (Compl., Ex. 6, ¶ 67). In fact, Mango DAO has had to reverse actions taken by Kramer and Schneider to avoid potential liability including burning tokens.[28] (Durairaj Decl., ¶ 31.)

Far worse will occur if Kramer is permitted to continue looting and attacking the DAO with his fraudulently acquired tokens. He is likely to bungle the claims against Eisenberg, which he has already attempted to do, and he is likely to drain the DAO treasury for himself. In the process, Kramer and Schneider will generate additional risks to the DAO and claims against it. Just this week, for instance, Schneider has attempted to haphazardly shut down Mango Markets through unilaterally increasing interest rates to 180% on depositors with little notice—something that is clearly a bad idea that would harm the DAO and its depositors. The only irreparable harm, consequently, would be to the DAO and its members (who have assigned claims to Mango Labs) if Kramer is permitted to continue his unlawful raiding of the DAO. The heavy leaning of the balance of hardships towards the DAO and Defendants, against Kramer, is an independent reason

---

[26] Even if there was any merit to the assertion, the Southern District of New York would be the proper court to determine any violation and contempt. *Bruce v. Citigroup Inc.*, 75 F. 4th 297, 303-06 (2nd Cir. 2023) (denying plaintiff's requested relief because "[t]he civil contempt power is, at its core, uniquely personal to each court …" and to be wielded by the court offended by a violation); *Grana v. Warden of Metro. Corr. Ctr.*, No. 88 CIV 2793 (MBM), 1989 WL 16566, at *1 (S.D.N.Y. Feb. 23, 1989) (citations omitted) ("It is well established, however, that a federal district court cannot find a party in contempt of another court's order.").

[27] https://discord.com/channels/791995070613159966/1196438537495642253/1306823588342661161

[28] https://discord.com/channels/791995070613159966/873184582948765736/1320927573315817493

to deny the request for a preliminary injunction. *See Esso Standard Oil Co. (P.R.) v. Monroig-Zayas*, 445 F.3d 13, 17-18 (1st Cir. 2006) (quoting *Bl(a)ck Tea Soc'y v. City of Boston*, 378 F. 3d 8, 11 (1st Cir. 2004)); *Phillips v. Willis Re Inc.*, No. 20-1635 (FAB), 2020 WL 6789045, at *1 (D.P.R. Nov. 18, 2020) (citing *Planned Parenthood League v. Bellotti*, 641 F. 2d 1006, 1009 (1st Cir. 1992)).

The public interest factor weighs against Kramer too.[29] The Council did not take any 'extra-legal self-help,' as Kramer misleadingly characterizes the action (Mot. at 17), but simply exercised its authority—as designed—to stop his attack. There is no obligation stated in any DAO policy that Kramer be permitted to loot the DAO, misappropriate all its funds, and render the DAO incapable of defending itself against him. That is precisely why the DAO members created the Council.

Because Kramer's purported harms can all be remedied with a money judgment and are easily calculable, and because there is no risk of any harm at all given the temporary and reversible nature of the freeze action, the Court should deny the request for injunctive relief on these grounds alone.

## V.      CONCLUSION

The DAO's freeze action was proper, lawful, narrowly tailored, and necessary to stop Kramer from destroying the DAO and unlawfully misappropriating all of its funds. Kramer's legal theories all fail even if his allegations are taken as true. And given the major factual disputes, he cannot establish any of his theories at this early point in the case under any circumstances. The

---

[29] *See, e.g.*, *Doble Seis Sport TV, Inc. v. P.R.*, No. 18-1432 (ADC), 2019 WL 1153432, at *6 (D.P.R. Mar. 12, 2019) (denying motion for injunction because unsubstantiated arguments in favor of public interest were inadequate as a basis to grant injunctive relief); *Freightliner, L.L.C. v. P.R. Truck Sales, Inc.*, 399 F. Supp. 2d 57, 78-79 (D.P.R. 2005) (denying request for injunction because public interest was better protected by denying injunctive relief).

Court should consequently deny Kramer's preliminary injunction motion because he fails to clear the high bar for injunctive relief at this stage of the proceedings.

**RESPECTFULLY SUBMITTED.**

On this 15th day of January 2025, in San Juan, Puerto Rico.

**WE HEREBY CERTIFY** that on this date, the foregoing was electronically filed with the Clerk of Court, using the CM/ECF system, which will provide access to all parties of record.

Dated: January 15, 2025                                Respectfully submitted,

**GREENBERG TRAURIG, LLP**
101 Second Street, Suite 2200
San Francisco, California 94105
Tel: (415) 655-1300
Fax: (415) 707-2010

*/s/ Michael Burshteyn*
MICHAEL BURSHTEYN
California Bar No. 295320
Email: Michael.Burshteyn@gtlaw.com
*Admitted Pro Hac Vice*

CARLOS J. ANDREU COLLAZO
USDC-PR No. 307214
**GREENBERG TRAURIG, P.A.**
333 S.E. 2nd Avenue, Suite 4400
Miami, Florida 33131
Tel: (305) 579-0500
Fax: (305) 951-0717
Email: carlos.andreu@gtlaw.com

RAFAEL YAKOBI
California Bar No. 312421
**THE CRYPTO LAWYERS, PLLC**
11035 Lavender Hill Dr, Ste. 160-220
Las Vegas, NV 89135
Tel: (619) 317-0722
Email: rafael@thecryptolawyers.com
*Admitted Pro Hac Vice*

*Attorneys for Defendants*