THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| JOHN KRAMER, | CIVIL No.: 3:24-cv-01587 |
| *Plaintiff,* | |
| | JURY TRIAL DEMANDED |
| v. | |
| MANGO LABS, LLC, DAFYDD DURAIRAJ, and TYLER SHIPE | |
| *Defendants.* | |

**PLAINTIFF'S  PRE-HEARING BRIEF
ON PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

TO THE HONORABLE COURT:

The following is respectfully submitted on behalf of Plaintiff John Kramer in anticipation of the hearing scheduled by this Court on Plaintiff's Motion for a Preliminary Injunction.  Plaintiff John Kramer seeks an Order directing immediate rescission of the actions taken by Defendants as referenced in the "December 11 Announcement"  defined and described herein and any subsequent actions undertaken by Defendants, as well as enjoining Defendants from taking any action that impairs or interferes with Plaintiff's disposition of assets, including but not limited to Plaintiff's MNGO tokens, or otherwise violates federal law or any existing Court Order.

**1.  Plaintiff Attorneys Involved in the Preliminary Injunction Hearing**

William J. Hughes, Jr, Esq., Porzio Bromberg & Newman, wjhughes@pbnlaw.com; Jill Williamson, Esq., Porzio Bromberg & Newman, jwilliamson@pbnlaw.com; Francisco E. Colon-Ramirez, Esq., fecolon@colonramirez.com.

### 2.  Factual Statement of Each Party's Claim or Defense

Plaintiff John Kramer has moved before this Court for a Preliminary Injunction pursuant to 18 U.S.C. § 1030(g) and Fed. R. Civ. P. 65 in order to return the status quo ante and prevent further irreparable harm; to prevent further violations of 18 U.S.C. § 1030(a)(4) and (b); and to prevent further violations of an Order of the U.S. District Court for the Southern District of New York. Defendants  -- for their own improper purposes -- contrived a false reason to freeze out Plaintiff from use of his MNGO tokens by labeling Plaintiff's purchase of MNGO tokens that had been held by the FTX bankruptcy estate as "fraudulently acquired."   Defendants used their access as members of the "Upgrade Council" to the governance software of the Mango DAO to modify this software to allow them to freeze Plaintiff's MNGO tokens, and grant a wallet controlled by them eight times more voting power. The use the Upgrade Council in this manner was either unauthorized or exceeding the authorization granted to the Council.

Regardless of the veracity of the Defendants' claimed justification for their conduct (which is clearly and demonstrably a contrived falsehood), the Defendants' conduct was unauthorized and exceeded their authorization, and there is no such thing as a "justification" defense to seizing another's property because it is believed that it was improperly obtained.  Besides, there was nothing fraudulent about the acquisition of the MNGO tokens. Indeed, Defendants were not a party to Plaintiff's acquisition of the MNGO tokens, and the seller of those tokens to Plaintiff -- having received the negotiated acquisition price from Plaintiff as buyer -- has not asserted that the MNGO tokens were "fraudulently acquired" from it. Defendants' entire defense of its actions is based upon the false premise that the MNGO tokens were "fraudulently acquired" by Plaintiff and

therefore he cannot participate in the governance of the Mango DAO. Knowing that Defendants cannot establish to this Court that the MNGO tokens were fraudulently acquired by Plaintiff, rather than seeking a preliminary injunction against John Kramer (which would not be granted), Defendants instead opted to engage in unlawful self-help to the continuing harm of Plaintiff.

This is an important point that is worthy of emphasis: when the Defendants improperly froze the Plaintiff's tokens, the had already initiated a lawsuit in **this Court**. They could have moved for an injunction, which would have been the proper thing to do. They did not, and they chose instead to take the law into their own hands.

As to Plaintiff's damages, Defendants have acted intentionally and without authority to deprive Plaintiff of his property and the right to participate in the governance of the Mango DAO. Contrary to the contentions of Defendants, the results of their unlawful actions are not quantifiable and therefore not compensable by money damages only. Rather, by their action, Defendants -- for their own improper purposes -- obviously intended to maintain absolute control of the Mango DAO, and they have deprived Plaintiff of his ability to participate in the governance of the DAO at a critical time in the DAO's history. One of the major concerns set forth by Plaintiff in his initial moving papers is that Defendants could vote to dissolve the DAO and/or distribute the treasury which would inure primarily to their benefit and would be impossible to undo once dissolved. Since the filing of this action, the members of the DAO have taken concrete steps to wind down the activities of Mango Markets and dissolve the DAO. With Plaintiff currently having no ability to vote on these decisions, as is his right as a MNGO token holder. This too is

intentional by Defendants. The continuing inability of Plaintiff to participate in the governance of Mango DAO is not compensable by money damages.

It must be emphasized herein that Defendants do not dispute they have deprived Plaintiff of the ability to utilize his MNGO tokens. Defendants instead as part of the motion practice precedent to this hearing baldly state the following: "The freeze action is temporary. The freeze action is only during the pendency of the case." (Defendants' Response Brief, Page 23).  This statement is inconsistent with the public statement made by Defendant Durairaj on December 11, 2025: "The addresses holding the fraudulently obtained FTX Estate tokens are frozen and nullified *until a settlement or court order requires their release*."  Defendants essentially tell this Court to ignore the fact that they have not established in any way any wrongdoing on the part of Plaintiff, but do not worry, we (Defendants) shall only deprive John Kramer of his property and property rights so long as *we are not forced to give them back*. Despite best efforts, Kramer has been unable to reach a settlement with Plaintiffs, he  now seeks a court order, as implicitly invited by Defendants.  The damage to Plaintiff by Defendants' misconduct in such a case as this is not quantifiable insofar as unlawfully depriving Plaintiff of the ability to utilize his MNGO tokens in any manner he sees fit on its face results in unspecifiable damages not compensable by money damages alone.  It is important to note, however, that since one of the grounds for a preliminary injunction is based on 18 U.S.C. § 1030(g), there is no requirement of irreparable harm to be entitled to injunctive relief: all that is necessary is that the elements of the federal crime is established along with a showing that the value element is met.

The following facts are relevant to the summary set forth hereinabove and shall be presented by Plaintiff at the Preliminary Injunction hearing.

1.      In the center of this case is a type of entity that has attained relative popularity in the blockchain and crypto community-- a Decentralized Autonomous Organization, or "DAO."

2.      A DAO can take many forms. Many are unincorporated associations, some are formed as cooperatives, foundations, or limited liability companies (under the laws of different jurisdictions), and some are general partnerships, either by design, or operation of law. What almost all DAOs have in common is that governance and finances are managed on the blockchain through governance proposals and votes of its members. In essence, there is no hierarchical structure or organized leadership in DAOs; all organizational decisions are put to a vote by members, and depending on the issue, some members and entities are designated by the collective to act on their behalf.[1]

3.      DAO membership is based upon the ownership MNGO, of the DAO's digital tokens known as "governance tokens."

4.      Mango DAO is an unincorporated organization that calls itself a DAO, and it is composed of holders of MNGO tokens ("members"), which is a digital asset which was created to be the governance token for Mango DAO. The Mango DAO *is not*

---

[1] "A DAO is a 'decentralized autonomous organization' which is a way to organize people, a social coordination technology that relies on blockchain-based smart contracts and incentives to facilitate collaboration and collective action. Put differently, DAOs allow unrelated parties to use software code on a blockchain without needing a centralized coordinating authority, and permit users "to take actions to edit open-source software." *CFTC v. Ookie DAO*, No. 22-05416, Dkt No. 63 at 3 (N.D. Cal. Dec. 20, 2022) (internal citations omitted). Some DAOs are legal entities such as cooperatives, associations, foundations, or LLCs. Other DAOs, such as the Mango DAO, are not formal legal entities.

organized under any law of an State of the United States of America. The governance of the Mango DAO, like other DAOs is managed through its software by votes of its members, as recorded on the blockchain. As a general rule, the more MNGO tokens a token holder has, the more voting power they have; however, in certain circumstances, a member may double their voting power. Under the established rules of the DAO, this additional voting power comes at a cost—the member must "lock" their MNGO for 5 years. During the period that the MNGO tokens are "locked" they can be used to cast votes, but they cannot be transferred to another digital wallet, which makes them essentially unsaleable.

5.      Mango DAO was organized to be the governing body of Mango Markets ("Markets"), a decentralized crypto trading and lending platform. The DAO also holds a considerable treasury, currently approximately $45 million in a variety of cryptocurrencies.

6.      The broad strokes of the operation of the Mango DAO and Markets is outlined in the Mango DAO litepaper ("Litepaper"). According to the Litepaper, MNGO "token holders have the power to upgrade the protocol as they see fit, only constrained by the checks-and-balances of the DAO."[2] According to its published guidelines, DAO governance is meant to govern upgrades and changes to the software that runs Markets, and should be limited to actions that can be implemented via computer code.[3]

7.      In the last year, however, the governance process has also been used to appoint a legal representative to represent the DAO's interests in the cases brought against the DAO by the U.S. Securities and Exchange Commission (the "SEC") and the

---

[2] *See* Compl. Ex. 1.
[3] *Id.*

Commodities Futures Trading Commission (the "CFTC"), to approve a settlement with the SEC, and to approve a settlement offer to be made to the CFTC, among other actions. Whether governance actions not capable of being implemented by computer code are binding on all members of the DAO is an open question, which need not be resolved here.

8.      The DAO has no officers, directors, or any other individuals generally empowered to make decisions on its behalf, or on behalf of its members; rather, all actions must be taken by a vote of the members.

9.      John Kramer is a holder of MNGO tokens and a member of the Mango DAO. Upon information and belief, Tyler Shipe and Dafydd Durairaj are also a holders of MNGO tokens and members of the Mango DAO.

10.      Pursuant to court order, discussed in more detail below, Defendant Mango should not be a holder of MNGO tokens, or a member of Mango DAO.

11.      On September 27, 2024, the SEC filed a complaint against Mango DAO, Mango Labs, LLC ("Labs") and the Blockworks Foundation.[4]  The SEC primarily alleged that Mango DAO and Blockworks Foundation engaged in an unregistered security offering when they issued and sold MNGO tokens and that Labs and Blockworks Foundation acted as unregistered brokers related to the sale of MNGO tokens, as well as other activities.

12.      On October 1, 2024, a Final Judgement was entered against Labs  in accordance with a settlement agreement with the SEC.  Per the settlement agreement and final judgment, Labs was ordered to, among other things, to pay a fine of  $223,228.00 and to burn (i.e., destroy) all of its MNGO tokens by October 11, 2024 (within 10 days of the entry

---

[4] *See* Compl. Ex 6 (hereinafter referred to as the "SEC Action").

of the final judgement).[5]  Accordingly, if Labs is in compliance with the Court's order, Labs is neither a MNGO token holder, nor a member of the Mango DAO.  The DAO is also under investigation by the Commodities Futures Trading Commission ("CFTC"), and pursuant to a governance proposal approved by the members, has submitted a settlement offer to the CFTC.

13.     Three years ago, a governance proposal was passed by the Mango DAO to form an "Upgrade Council."[6]  The DAO members approved the establishment of a council comprising seven (7) named individuals and the wallets they control.[7]  The members of the DAO vested the Upgrade Council with the authority to "control upgrades of the mango v3 program" through a majority vote of its seven members.[8]  The authority of software controlled by the wallet was subsequently expanded to include the authority to control program code errors in the "Voter Stake Registry," the software that controls the weight of each vote, among other things.

14.     Among the seven named signatories were Defendants Shipe and Durairaj. Upon Information and belief, the wallet named in the proposal as controlled by Durairaj (the

---

[5] *See* Compl. Ex 3.
[6] *See* Compl. Ex. 4.
[7] A digital wallet is a piece of hardware or software used, among other functions, to 'store' digital assets and to provide a user-friendly way to store and manage the "public keys" and the "private keys" necessary to authorize transactions on a blockchain. The public key is used to access the user's blockchain "address," and it can be freely shared with others. The private key is roughly analogous to a password; it confers the ability authorize a transaction on the blockchain using the user's public blockchain address, often referred to as "signing" a transaction. Wallets may have a single private key holder, or signatory, or they may have multiple private keys held by multiple individuals, known as a "multi-sig" wallets.  Rules may be set for each multi-sig wallet determining how many signatories there should be, and how many of those signatories are required to "sign" a transaction.   In some cases, such as for the Upgrade Council multi-sig, those signatories are designated by issuing, or "minting" a token specific to that wallet.  Those who hold a token in their wallet are able to use that token to sign transactions with the multi-sig wallet.
[8] *See* Compl. Ex. 4.

"2CC Wallet") is actually owned by Labs, a single member Wyoming limited liability company owned by Durairaj.

15. The 2CC Wallet has routinely received payments from the DAO specifically designated for Labs, and Labs also claims a transaction of the 2CC Wallet as its own in the Complaint filed against Petitioner in civil action number No. 24-1469-GMM, on October 7, 2024. [9] Despite the October 1, 2024 final judgment in the SEC Action, the 2CC Wallet currently holds over 93 million MNGO tokens. Accordingly, Defendant Mango Labs and its sole member, Defendant Durairaj are in contempt of the Court's October 1, 2024 Final Judgement, which required that all of its MNGO tokens be burned.

16. The Upgrade Council exercises its authority through a multi-signature, or "multi-sig", wallet. Each signatory receives a special token in their designated wallet. The 2CC wallet, held one of these seven tokens. Wallets with a signatory token in them can sign transactions for the Upgrade Council multi-sig wallet, and the Upgrade Council multi-sig wallet can be used to execute almost any change to the software used for DAO governance and the software that runs Markets.[10]

17. On October 7, 2024, Labs filed civil action number No. 24-1469-GMM against the Plaintiff, Maximillian Schneider and Does 1-20, in United States District Court for the District of Puerto Rico (the "Complaint").[11] The Complaint was culmination of many months

---

[9] *See* Compl. Ex. 6 ¶70 (citing FN 9, Compl. Ex. 6a).
[10] Imagine a computer terminal with superuser access to the software that operates voting machines (the Upgrade Council multi-sig). Then imagine that this terminal requires four separate keys to turn it on (the Upgrade Council Tokens). Then imagine that seven keys were deposited into safes, any four of which could turn on the computer terminal, and only the individual that owned the safe (or if owned by an entity, an individual authorized to act on behalf of that entity) knows the combination of that safe (the Council Members' wallets). This is the analog analogy for how the Upgrade Council works to modify the DAO governance software.
[11] *See* Compl. Ex. 6.

of disagreement between the Petitioner and the Respondent regarding MNGO tokens, valued at the time this action commenced at approximately $12.9 million, that Plaintiff purchased from a willing third party seller, who, upon information and belief, had purchased them from the FTX bankruptcy estate ("Petitioner's Tokens").

18.     On or around December 6, 2024, four of the Upgrade Council signatories resigned, "burning' their multi-sig tokens, leaving only Labs, Tyler Shipe, and Maximillian Schneider as signatories.  In response to these resignations, Plaintiff John Kramer made several governance proposals with the goal of bringing the Upgrade Council back up to the full seven members originally authorized.  All of these proposals were defeated after Defendants fraudulently obtained their actual unassailable block of voting power.[12]

19.     Rather than wait until the resolution of the case filed by Defendant Labs, or seeking injunctive relief in that case, Defendants engaged in extralegal self- help, exceeding their authority to access the DAO governance software to intentionally deprive Petitioner of the rights and value of his property.  On December 11, 2024, Dafydd Durairaj, acting on behalf of Labs and Tyler Shipe (two of the three remaining Upgrade Council signatories) grossly exceeded their authority and used the Upgrade Council multi-sig to intentionally deprive John Kramer of the use and value of his property, to stop John Kramer from restoring the Upgrade Council multi-sig, or otherwise stopping Defendants' takeover, and gain unfettered control over all governance actions, the DAO treasury, and the operation of Markets.

20.     As Defendant Durairaj announced in the Mango DAO governance discord chat ("December 11 Announcement") they took two actions:

---

[12] *See* Compl. Ex. 7a, 7b, 7c.

1. Freezing and nullifying John Kramer's Tokens "until a settlement or court order requires their release;" and,

2. Granting a wallet controlled, upon information and belief, by Durairaj eight times more voting power than it is entitled to under normal governance measures (no other member can obtain 8x voting power) so that he can defeat governance proposals he disapproves of, and pass any proposals he desires.

(the "December 11 Transaction").

21.     In the December 11 Announcement, Defendant Durairaj, in addition to other falsehoods, states "the Council acted today because the attackers gained an unassailable bloc of raw voting power"[13] This statement is demonstrably untrue, as several proposals made by John Kramer in weeks just prior to the December 11 Announcement did not receive enough votes to pass,[14] and was with the intent to deceive in furtherance of the Defendants' unlawful aims.  It is important to emphasize that the sole purpose of the Upgrade Council was to ensure that the DAO's software and infrastructure could be upgraded, and code errors corrected, through the decisions of seven DAO members. The Defendants – just two members of the Council – have highjacked the DAO's governance and have utilized their power to strip John Kramer of his tokens, his votes, and his money. Since the actions of December 11, Defendant Labs has proposed another governance proposal which would strip further members of their rightfully earned tokens, again with deceptive justification.[15]

---

[13] Dec 11 Announcement
[14] *See e.g.* Compl. Ex. 7d; *see also* Ex. 7a, 7b and 7c (which proposals were defeated through the use of Respondents' self-granted 8x voting power).
[15] *See* Compl. Ex. 9.

22.     Notably, a similar proposal by Defendant Mango made several months ago was defeated without Plaintiff deploying his so-called "unassailable bloc [sic]" of votes.[16] Also notable is that this proposed action would significantly decrease the voting power of another leading voice in the DAO, CyberByte sp. z.o.o. ("CyberByte"), who had been elected by the DAO to serve as the DAO representative in the cases brought by the SEC and CFTC. Upon information and belief, CyberByte was elected to represent the DAO because the DAO members were concerned that Labs and Durairaj had a conflict of interest and wouldn't be appropriate representatives.

23. Defendants' actions have raised concerns among MNGO token holders that any MNGO Tokens deposited to participate in DAO governance are subject to conversion. As fewer and fewer members are willing to endanger their MNGO Tokens to try have a voice, Defendants' power over the DAO becomes absolute.

24.     Defendants have taken advantage of this power and lack of participation from other members to further neuter other potential disagreement.  Defendants made a governance proposal to claw back MNGO tokens options grants earned by Maximilian Schneider, under the false assertion that such claw back was required by the SEC Settlement.  At the time of this filing of this case, the proposal is was still open for voting, but given Labs' 8x voting power, and the nullification of most of Plaintiff's voting power, the result was just a matter of time.  The proposal passed with the 2CC wallet casting almost 2/3 of the votes in favor.[17]  All the while, these actions inure to the direct benefit of the Defendants because they now have complete control of the DAO and have exponentially increased the value of their own tokens.

---

[16] *See* Compl. Ex. 10.
[17] https://app.realms.today/dao/MNGO/proposal/J8Y5Xz4oHTPEPfE2ZagvCLoFvvEYeUV7FY4CbgDRZT7V/explore

25.     Since the time of the filing of this case, the 2CC wallet has made a governance proposal to rescind the CFTC Settlement Offer,[18] A proposal that passed with the 2CC wallet again casting almost 2/3 of the votes in favor.[19] And has cast the definitive, and many times the only vote in favor of actions progressing the shut down of Mango Markets and the DAO.[20]

26.     In sum, defendants Durairaj and Labs utilized tokens which it had been ordered to destroy two months prior in order to effect a change on the DAO software which was unauthorized and exceeded their authorization. They continue to use this wallet to take irreversible actions which are existential to the DAO and could have serious liability consequences for the DAO and its members. This was done with the consent and the assistance of Defendant Shipe, who provided the second of the necessary two out of three signatures.

27.     The impact of this unauthorized action is threefold. First, it has deprived Plaintiff John Kramer of his ability to utilize his MNGO tokens to vote and participate in the governance of the DAO. Second, Defendants have defrauded the DAO members by stripping ordinary token holders of ordinary weighting of their votes and grossly increased the defendants' control over the DAO, and creating an atmosphere of fear among DAO members, as evidenced by the very limited voting participation by any actors other than the Defendants since December 2024. Third, it has deprived John Kramer of the value of his tokens meaning that the Defendants have now declared John Kramer's tokens – worth

---

[18] https://app.realms.today/dao/MNGO/proposal/GEQUfS7pCm3c7Z6taNrghqrixJfUE3K7gxvGWKubA7qZ
[19] https://app.realms.today/dao/MNGO/proposal/GEQUfS7pCm3c7Z6taNrghqrixJfUE3K7gxvGWKubA7qZ/explore
[20] *See, e.g.* Reduce only Markets
https://app.realms.today/dao/MNGO/proposal/7EPjCyiEaY3hgmgsnoHpU4w4YsReUjU5y1p7mu6nu5Wv, voting
https://app.realms.today/dao/MNGO/proposal/7EPjCyiEaY3hgmgsnoHpU4w4YsReUjU5y1p7mu6nu5Wv; Put
tokens in force withdraw 2
https://app.realms.today/dao/MNGO/proposal/NotfWLfh9ewGETF5mPJvKTYSX64ajUhLwhgcEpSyayN, voting
https://app.realms.today/dao/MNGO/proposal/NotfWLfh9ewGETF5mPJvKTYSX64ajUhLwhgcEpSyayN/explore.

millions – to be worth nothing and have no financial or utilitarian value. And finally, Defendants have exponentially increased the value of their own tokens by removing the largest block of tokens from utilization. They now have unfettered power to distribute the DAO's $45 million treasury, make further changes to DAO governance up to and including dissolving the DAO, deprive further DAO members of their MNGO tokens, , and control the functioning of Markets—with the potential to defraud thousands of investors using the Markets platform.

### 3. Statement of Plaintiff's Contentions with Respect to any Controverted Material Fact, Contested Issue of Law, Including Evidentiary Questions, Together with Supporting Authority.

When evaluating a request for injunction under Rule 65, courts must consider the following four factors that apply to a motion for preliminary injunction, namely: (1) the likelihood of success on the merits; (2) the potential for irreparable harm if the request is denied; (3) the balance of hardships; and (4) whether the TRO is in the public interest. *Domingo Andino Marrero Est. v. Wilmington Sav. Fund Soc'y, FSB,* No. CV 24-1545 (RAM), 2024 WL 4906022 (D.P.R. Nov. 27, 2024), *citing Charlesbank Equity Fund II v. Blinds To Go, Inc.,* 370 F.3d 151, 161-162 (1st Cir. 2004) ("We hold that the traditional four-part preliminary injunction standard applies in full flower to motions brought under Rule 65 in hopes of securing prejudgment freeze orders.").

**Likelihood of Success on the Merits**

*Violation of Computer Fraud and Abuse Act*

Under 18 U.S.C.A. § 1030 (a)(4) "[whoever] knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value,

unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period." Subsection (g) of §1030 provides that "[a]ny person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief" if the conduct involves, among other possibilities, loss to 1 or more persons during any 1-year period aggregating at least $5,000 in value. The term "protected computer" means a "computer that is used in or affecting interstate or foreign commerce or communication." 18 U.S.C §1030 (e)(2)(B). Courts have interpreted the term computer broadly, applying the statute to databases (*United States v. Valle,* 807 F.3d 508, 513 (2d Cir. 2015); Email servers, cloud-based email accounts, and other cloud computing-hosted data and services accessed via the internet (*SkyHop Tech., Inc. v. Narra,* 58 F.4th 1211, 1227 (11th Cir. 2023); *Abu v. Dickson,* 2021 WL 1087442, at *5 (E.D. Mich. Mar. 22, 2021); *Florida Atlantic Univ. Board of Trustees v. Parsont,* 465 F.Supp.3d 1279, 1290 (S.D. Fla. 2020)); and software platforms (*SMH Enterprises, L.L.C. v. Krispy Krunchy Foods, L.L.C.,* 2021 WL 1226411, at *3 (E.D. La. Apr. 1, 2021)).

*The DAO governance software is a protected computer*

The DAO governance software, VSR software and, Markets software all fall squarely within the meaning of a "protect computer" under 18 U.S.C §1030. They are all designed and used to conduct transactions with thousands of members across the U.S. and around the world.

*Defendants accessed the DAO governance software and VSR software with the intent to defraud and without authorization, or alternatively, exceeded their authorization*

The governance proposal that authorized the creation of the Upgrade Council and related multi-sig wallet contained three provisos:

1) That the purpose of the authorization was to "control upgrades of the mango v3 program" and quality control of the VSR program;

2) That the Council was to comprise seven specific members, who together with the wallets they controlled, were specified;

3) That actions by the Council were to be taken by a majority of the seven named members.

Any use of the Council multi-sig that didn't meet these three conditions was either not authorized or far exceeded the authorization of the Upgrade Council governance proposal. The December 11 Transaction did not meet any of the requirements, it was entirely unrelated to upgrades of the mango v3 program or quality control of the VSR software, the Council only had three members, not seven, and only two signatories signed the transaction, not four of the seven authorized signatories.

The language "with the intent to defraud" in §1030(a)(4) is meant to differentiate between computer trespass, where an individual gains unauthorized access, but without the intent of taking anything of value, and computer fraud, where the unauthorized access is for the purpose of taking something of value. *See, United States v. Czubinski,* 106 F.3d 1069, 1079 (1st Cir. 1997). In this case Defendants not only intended to deprive Plaintiff of the use and value of his MNGO token, but by freezing and nullifying his tokens, and granting 8x voting power to Defendant Durairaj's tokens, they gain the voting power to propose and pass further governance proposals to enrich themselves. In addition, they put forth a number of falsehoods in an attempt to justify their actions, and to disguise their

true intent.  Specifically, they falsely claimed that John Kramer had "fraudulently obtained FTX Estate tokens" and that he was engaging in a "governance attack" and that he had "gained an unassailable bloc [sic] of raw voting power which they have been using to extract funds from the treasury, violate court orders and, most importantly, attempt to mint Developer Council[21] tokens to grant them total control over Mango DAO and associated programs."[22] Defendants' fraudulent intent was further evidenced by the fact that they also granted additional voting power to a wallet, upon information and belief controlled by Dafydd Durairaj[23], which means that Defendant Durairaj now has the power to run the MNGO DAO without input from any other members.  In other words, although Defendants among other things falsely claimed they were countering John Kramer's "unassailable bloc [sic] of raw voting power", they have in fact created for Durairaj an actual unassailable block of raw voting power.

*Conversion*

Under Puerto Rico law, the tort of conversion is the malicious and wrongful privation of the ownership rights, the illegal exercise, or the **assumption of authority over another's property, thereby depriving the lawful owner or possessor, permanently or for an indefinite period, of its use and enjoyment**. *United States v. GZ Constr. St, Inc.,* 155 F. Supp. 3d 147, 152 (D.P.R. 2015)(internal citations omitted) (emphases added).  By their own admission, Defendants have assumed authority over

---

[21]  Defendants refer to "Developer Council"; however, the wallet that took these actions was the wallet created pursuant to the governance proposal authorizing the creation of the "Upgrade Council." Respondent can only conclude that "Developer Council" is a misnomer.
[22] December 11 Announcement.
[23] It is not known whether Dafydd Durairaj owns this wallet in his individual capacity, or whether he controls it on behalf of Labs, as was asserted in the Mango Labs Complaint.

John Kramer's MNGO tokens, and intentionally deprived him of their use and enjoyment.[24] The facts are clear, public, and set forth in Defendants December 11 announcement: Defendants acted to freeze and nullify the wallet holding Plaintiff's MNGO tokens. Under Puerto Rico law, tortious actions (which includes the tort of conversion) are actionable under article 1536 of the Puerto Rico Civil Code of 2020, P.R. Laws Ann., Tit. 31, § 10801

*Violation of the U.S. District Court Order*

Based upon the evidence, which includes defendant Labs' claims to this very Court, it utilized tokens to effect the unauthorized action which it was ordered to destroy months ago by the U.S. District Court for the Southern District of New York. Without these tokens, it could not have stripped Plaintiff John Kramer of his own tokens and fraudulently obtained complete control over the DAO.

**Immediate and Irreparable Harm**

It is respectfully submitted that an injunction under 18 U.S.C. § 1030(g) does not require a showing of irreparable harm, as the act mandates an injunction to prevent continued and further violations of the act, as well as to prevent continuing harm. Thus, the required showing is that the Defendants have violated, or are violating, the act and that an injunction is required to prevent further violations or to prevent further harm. This has clearly been demonstrated.

Nevertheless, Plaintiff John Kramer has suffered and will continue to suffer irreparable harm if not granted the preliminary injunction sought herein. Through their wrongful acts, Defendants have granted themselves unfettered ability to control the

---

[24] December 11 Announcement.

Mango DAO governance software, and through that software to control the Markets protocol and the Mango DAO treasury. There are a number of irreparable harms facing Plaintiff through these actions including the inability to vote with the tokens that have been wrongfully frozen and nullified in governance actions such as:

1. Defendants have stripped Plaintiff John Kramer of his ability to utilize his tokens and vote on matters affecting the DAO. Conversely, Defendants' actions have increased the voting power of their own tokens, thus diluting the remaining DAO members' voting power. In effect, Defendants have hijacked the DAO, its $45 million treasury, and the Mango Markets DeFi investment platform.

2. Defendants have fraudulently reduced the value of John Kramer's tokens to $0 while increasing the value of their own tokens exponentially.

3. Defendants are continuing to utilize tokens to control the DAO's governance which the U.S. District Court for the Southern District of New York ordered to be destroyed months ago. Essentially, Defendants are in contempt of Court while they are committing a fraud upon the DAO and its members. The continuing violation of a U.S. District Court order is ipso facto irreparable harm.

4. Defendants are continuing to take actions toward the dissolution of the DAO and distribution of the treasury which would inure primarily to their own benefit. Dissolution of the DAO and distribution of the treasury is currently being considered by the members. Once the DAO is dissolved there will be no reconstituting it. There are tens of thousands of MNGO tokens holders around the globe, and almost 1,000 wallets are registered to vote on governance

actions. Many, if not most, of the token holders/members are identifiable only be the address of their digital wallets.

Conversations are also ongoing regarding the correct methodology for distributing the approximately $45 million in the DAO treasury. Some propose to distribute pro rata to all token holders, others propose to distribute in ways that are inequitable and harm Petitioner. The different approaches would result in drastically different outcomes for Petitioner. Because of the pseudonymity, and the sheer number of token holders, the possibility of reclaiming any distributed funds after the conclusion of litigation is, at best, extremely remote.

5. Pursuant to a proposal by the 2CC wallet, as feared when this case was filed the DAO voted to withdraw the settlement offer proposed to the CFTC. Such decision could have long-reaching effects on the DAO, its treasury, and on Markets.

In addition, while the tokens are frozen and nullified, they cannot be sold. Given the volatility of crypto markets, damages resulting from the inability to sell the tokens would be too speculative to recover.

**Balance of the Harms**

There is no harm to Defendants to return to the status quo ante. The best that they can argue is that the Plaintiff tried to prevent their power grab by ensuring that a 7 member Upgrade Council actually had 7 members, instead of three. On the other hand, Defendants will continue to violate the law and a Court order, and both the Plaintiff and the remaining DAO members will continue to be subject absolute control of Defendants if emergent relief is not granted.

**Public Interest**

Defendant Labs has a case pending against Plaintiff that alleges that the tokens it froze and nullified were fraudulently obtained, the same justification given for freezing and nullifying them. Defendants asked for injunctive relief in that case..  Defendants could have easily sought emergency relief in that action; however, they did not do so.  It is not in the public interest to allow individuals to engage in extra-legal self-help when they could obtain such relief from the courts if their claims are well founded. Further, it is in the public interest, as expressed by Congress in 18 U.S.C. § 1030(g), to prevent wrongdoers from continuing to harm individuals and to violate the law. Finally, it is also in the public interest to ensure that those who are subject to the Orders of a U.S. District Court actually follow whose Orders.

Plaintiff respectfully requests that the Court issue a Preliminary Injunction directing the immediate rescission of the actions taken by Defendants as referenced in the December 11 Announcement and any subsequent actions undertaken by Defendants and enjoining Defendants from taking any action that impairs or interferes with Plaintiff's disposition of assets, including but not limited to Plaintiff's Tokens or otherwise violates federal law or any existing Court Order.

**4.  Proposed Stipulations Concerning Facts and Documents which are not in Substantial Dispute**

The Parties have met and conferred and anticipate having a list of documents about which there is no substantial dispute by the date for submitting Exhibits to the court on May 1, 2025.

**5. Names and Addresses of All Witnesses Plaintiff intends to Call at the Preliminary Injunction Hearing**

John Kramer
Daffydd Durairaj
Tyler Shipe
Adrian LNU

**6. List of Documents and Items Plaintiff Intends to Offer as Evidence at the Preliminary Injunction Hearing, Sufficiently Describing Each Document or Item for Ready Identification. Any Document or Item Whose Admissibility is Stipulated are so Noted.**

The Parties anticipate submitting a list of documents and items to offer as evidence by the May 1, 2025 deadline, as well as a notation of any document or item whose admissibility is stipulated.

In San Juan, this 21st day of April, 2025.

I hereby certify that on this date I uploaded a pdf version of this document to the Court's CM/ECF system which will send notice of its filing electronically to all parties of record through their counsel of record.

Respectfully submitted,

**S/ FRANCISCO E. COLÓN-RAMÍREZ**
Francisco E. Colón-Ramírez, Esq.
Bar No.: 210510
E-mail: fecolon@colonramirez.com

**COLÓN RAMÍREZ LLC**
PO Box 361920
San Juan, PR 00936-1920
Tel.: (888) 223-2364
Fax: (787) 425-4731